1  Laurence O. Masson (CA Bar No. 87794)
   LAW OFFICE OF LAURENCE O. MASSON
2  2625 Alcatraz Avenue #206
   Berkeley, California 94705
3  Telephone: 1.510.735.9691
   lomlex@gmail.com
4

5  Robert P. Schuster (Applicant *pro hac vice*)
   WY Bar No. 4-1137
6  Bradley L. Booke (Applicant *pro hac vice*)
   WY Bar No. 5-1676
7  ROBERT P. SCHUSTER, P.C.
   P.O. Box 13160
8  Jackson, Wyoming 83002
   Telephone: 1.307.732.7800
9  bob@bobschuster.com
10

11 *Attorneys for Plaintiff Kieran T. Prior*

12            IN THE UNITED STATES DISTRICT COURT
13           FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                  SAN FRANCISCO DIVISION
15

16 KIERAN T. PRIOR,                    Case No.: CV 19-4572

17          Plaintiff,

18     v.                              **COMPLAINT FOR:**

19 JOHN L. THORNTON, BARRICK              1. WRONGFUL DISCHARGE IN
20 GOLD CORPORATION, an Alien                VIOLATION OF PUBLIC POLICY;
   Corporation, EMBER INC., a Foreign     2. BREACH OF FIDUCIARY DUTY;
21 Corporation, PETER E. BASS, and        3. NEGLIGENT INTERFERENCE WITH
   DAVID S. SONG,                            PROSPECTIVE ECONOMIC
22                                            OPPORTUNITY;
            Defendants.                   4. INTENTIONAL INTERFERENCE WITH
23                                            PROSPECTIVE ECONOMIC
                                              OPPORTUNITY;
24                                        5. NEGLIGENT INFLICTION OF
                                              EMOTIONAL DISTRESS;
25                                        6. INTENTIONAL INFLICTION OF
                                              EMOTIONAL DISTRESS; and,
26                                        7. FRAUD.

27

28                                    **JURY TRIAL DEMANDED**

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*        CASE NO. CV 19-4572
WRONGFUL DISCHARGE

Plaintiff Kieran T. Prior, for his Complaint against the defendants, alleges as follows:

## I.  **INTRODUCTION AND SUMMARY**

1.     This complaint alleges a pattern of concerted, abusive, tortious misconduct and manipulation by a powerful man, aided and abetted by his corporate and personal surrogates, that destroyed a trusting minority shareholder/employee's personal investment, sweat equity, and financial future in a technology company that he was effectively driving toward immense economic returns, and exacted an immense personal and emotional toll on him.

2.     The individual defendants John L. Thornton, Peter E. Bass, and David S. Song knowingly violated their corporate and other legal duties as controlling shareholder, shareholders, officers, and directors of Ember Inc.  Defendant Thornton, as Executive Chairman of Defendant Barrick Gold Corporation, deliberately disregarded glaring conflicts of interest and made legally improper and commercially impossible demands on Kieran Prior, a minority shareholder.  Then— acting in concert with one another---defendants terminated Mr. Prior's employment with Ember for refusing to accede to their improper demands.  This action seeks to compensate Mr. Prior for the investment and opportunity that have been wrongfully taken from him.

## II.  **PARTIES**

3.     Kieran T. Prior ("Mr. Prior") is a British citizen and a resident of the State of California.  At all times relevant hereto, he has been domiciled at 301 Mission Street, San Francisco, California 94105, with his wife, Barbara K. Prior.  He is a lawful permanent resident of the United States and maintains a Permanent Resident Card, commonly known as a "Green Card" issued by the United States government.

4.     John L. Thornton ("Mr. Thornton") is a citizen of the State of Florida and has been at all times relevant hereto.  He resides at 1236 South Ocean Boulevard, Palm Beach, Florida 33480.  At all times relevant hereto, Mr. Thornton has been the Executive Chairman of the Board of Directors of Defendant Barrick Gold Corporation, the Chairman of the Board of Directors of Defendant Ember Inc. through April of 2018, and the controlling shareholder and alter ego of Defendant Ember Inc. ("Ember"), exercising such measure of control over Ember that a unity of interest and ownership existed between it and Mr. Thornton and separate personalities no longer

2

1 existed such that a failure to disregard the corporate form would promote injustice and cause an
2 inequitable result.

3      5.     Mr. Thornton conducted business activities in California at all times relevant hereto
4 by virtue of his physical presence in California in furtherance of the business of Ember and his
5 work as chairman, controlling shareholder, and alter ego of Ember, which was and is a business
6 entity authorized to do business and doing business within the State of California.  Further, Mr.
7 Thornton conducted business activities in California in his position as Executive Chairman of
8 Barrick Gold Corporation and his positions with Ember, including his involvement with Barrick's
9 active and ongoing business relationship with Ember on the specific issues central to the claims
10 for relief alleged herein and including his personal visit to San Francisco on or about June 14,
11 2018, to meet with Mr. Prior---all as more specifically alleged in that section of this Complaint
12 denominated as "Facts Common to all Claims for Relief."

13      6.     Barrick Gold Corporation ("Barrick") is a multi-national mining corporation,
14 organized and formed under the laws of the Province of British Columbia, Canada, and authorized
15 by the British Columbia Corporate Registry.  Its head office in Canada is Brookfield Place, TD
16 Canada, Trust Tower, Suite 3700, 161 Bay Street, P.O. Box 212, Toronto, Ontario M5J 2S1.  It is
17 a publicly held company and its shares are traded on the New York Stock Exchange and the
18 Toronto Stock Exchange.  It conducts its business activities in Canada, the United States,
19 Argentina, Tanzania, and other countries in which its mines operate.

20      7.     As an alien corporation that lists and trades its stock on the New York Stock
21 Exchange, Barrick is subject to United States securities laws and other laws of the United States,
22 including maintenance of an agent for service of process within the United States---which is CT
23 Corporation System, 28 Liberty Street, New York, New York 10005.  Its principal place of
24 business in the United States is in the State of Nevada based on its operations conducted through
25 a joint venture denominated as "Nevada Gold Mines," an enterprise between Barrick Gold
26 Corporation (61.5 % owner) and Newmont Goldcorp Corporation (38.5% owner).  Barrick states
27 that the joint venture is the largest gold-producing complex in the world.

28

3

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*     CASE NO. CV 19-4572
WRONGFUL DISCHARGE

8.      Barrick conducted business activities in the State of California at the times relevant hereto through (a) its active and ongoing business operations with Ember on specific issues central to the claims for relief alleged herein, (b) its ongoing interactions with, and tortious misconduct against, Mr. Prior, a resident of the State of California, and (c)  the visit in person of its Executive Chairman in San Francisco on or about June 14, 2018, to meet with Mr. Prior regarding the specific issues central to the claims for relief alleged herein---all as more specifically alleged in that section of this Complaint denominated as "Facts Common to all Claims for Relief."

9.      As a corporate entity, Barrick can act only through its chairman, officers, directors, employees, and agents.  As the employer of those who set policy and who are involved with its business operations, Barrick is vicariously liable for the acts and omissions of its chairman, officers, directors, employees, and agents, including but not limited to Mr. Thornton (Executive Chairman) and Jonathan Drimmer (Vice President, Deputy General Counsel, and Chief Compliance Officer).

10.      Ember Inc. ("Ember") is a foreign corporation organized under the laws of the State of Delaware.  At the times relevant hereto, Ember was registered and authorized to do business in the State of California---in consequence of its Statement of Information filed with the California Secretary of State---and its principal place of business was located at 301 Mission Street, Apartment 47F, San Francisco, California 94105---Mr. Prior's residence.

11.      At the times relevant hereto, Ember was doing and transacting business in the State of California (a) through the business being conducted at its principal place of business in San Francisco, (b) through the business activities of its Chief Executive Officer, Mr. Prior, who was residing and domiciled in California, (c) through the business activities of Kevin Czinger ("Mr. Czinger"), a resident of California and a director and shareholder of Ember, (d) through the business activities of Peter E. Bass during his travels to California on Ember business, and (e) through the business activities of Mr. Thornton, including his visit to San Francisco on or about June 14, 2018, to meet with Mr. Prior regarding the specific issues central to the claims for relief alleged herein---all as more specifically alleged in that section of this Complaint denominated as "Facts Common to all Claims for Relief."

4

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*      CASE NO. CV 19-4572
WRONGFUL DISCHARGE

12.     At present, Ember has no principal place of business in California because, on November 7, 2018, Defendant Peter E. Bass---as an authorized officer on behalf of Ember---filed a Certificate of Surrender with the California Secretary of State, providing the new mailing address for copies of legal service as 3807 Williams Lane, Chevy Chase, Maryland 20815-4953.  In so doing, Ember surrendered its rights and authority to transact intrastate business in the State of California and consented to process against it being served upon the California Secretary of State upon any liability or obligation incurred within the State of California prior to the filing of the Certificate of Surrender.

13.     As a corporate entity, Ember can act only through its officers, directors, employees, and agents.  As the employer of those who set policy and who are involved with its business operations, Ember is vicariously liable for the acts and omissions of its chairman, officers, directors, employees, and agents, including but not limited to Defendant Thornton, Defendant Peter E. Bass, Defendant David S. Song, and Kevin R. Czinger.

14.     Peter E. Bass ("Mr. Bass") is a citizen of the State of Maryland and has been at all times relevant hereto.  He resides at 3807 Williams Lane, Chevy Chase, Maryland 20815-4953---the current authorized business location for Defendant Ember.  At the times relevant hereto, Mr. Bass has been a chairman, director, officer, and shareholder of Defendant Ember.

15.     Mr. Bass conducted business activities in the State of California at the times relevant hereto (a) by his engagement as chairman, director, officer, and shareholder of Defendant Ember for its activities as a business entity authorized to do business and doing business within the State of California, (b) through his physical presence in California to conduct Defendant Ember's business, (c) through his ongoing interactions with Mr. Prior, a resident of the State of California, and (d) through his ongoing transactions with, and the active tortious misconduct against, Mr. Prior that constitute specific bases for the claims for relief alleged herein---all as more specifically alleged in that section of this Complaint denominated as "Facts Common to all Claims for Relief."

16.     David S. Song ("Mr. Song") is a citizen of the State of New York and has been at all times relevant hereto.  He resides at 5 Verona Place, Brooklyn, New York, 11216.  At the times

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

1 | relevant hereto, Mr. Song has been General Counsel for Defendant Ember as well as an officer of
2 | the corporation.

3 |     17.     Mr. Song conducted business activities in the State of California at the times
4 | relevant hereto (a) by his engagement as General Counsel and an officer of Defendant Ember for
5 | its activities as a business entity authorized to do business and doing business within the State of
6 | California, (b) through its on-going interactions with Mr. Prior, a resident of the State of California,
7 | and (c) through the active tortious misconduct in which he engaged against a resident of California
8 | (Mr. Prior) that constitute specific bases for  the claims for relief alleged herein---all as more
9 | specifically alleged in that section of this Complaint denominated as "Facts Common to all Claims
10 | for Relief."

### III.     JURISDICTION

12 |     18.     This Court has original jurisdiction over the subject matter of this action under 28
13 | U.S.C. § 1332(a)(1) in that there is complete diversity of citizenship between the plaintiff who, for
14 | diversity purposes, is a citizen of the State of California, and the defendants who are citizens of
15 | Florida, Canada, Delaware, Maryland, and New York.

16 |     19.     The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars
17 | ($75,000.00) exclusive of interest and costs in conformity with the provisions of 28 U.S.C. §
18 | 1332(a).

19 |     20.     This Court has personal jurisdiction over the defendants by virtue of their
20 | transaction of business activities within the State of California and as further described in
21 | Paragraphs 5, 8, 11, 12, 15, and 17.

### IV.     VENUE

23 |     21.     Venue of this action lies in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c),
24 | and (d) because (a) a substantial part of the omissions and events giving rise to the claims occurred
25 | in this District, (b) this is a District in which the defendants are subject to the Court's personal
26 | jurisdiction with respect to this action and/or the District in this State where defendants have the
27 | most significant contacts, (c) Mr. Prior is domiciled and resides in this District, and (d) Defendant

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*        CASE NO. CV 19-4572
WRONGFUL DISCHARGE

Ember maintained its principal place of business in this District at the times relevant to the claims for relief asserted herein.

## V.   FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A. Mr. Prior's Background.

22.     Mr. Prior was born in Manchester, England in 1978. From the time of his birth, he was diagnosed with severe cerebral palsy, yet it was later clarified as secondary non-genetic dystonia.  Cerebral palsy is disabling and usually manifests in significant cognitive damage and motor dysfunction.  On the other hand, dystonia is a neurological movement disorder that causes muscles to spasm or contract involuntarily, but spares cognitive functions.  Mr. Prior experiences sustained muscle contractions that lead to uncontrollable twisting, repetitive movements as well as abnormal and distorting postures.  Unpredictable spasticity or flailing-like movements can result.  His vocal cords are also affected, making it difficult for him to produce clearly understandable and fluent, sustained speech. His swallowing mechanisms are disrupted, making it difficult to eat and drink.

23.     Mr. Prior has been so disabled since birth.  He is wheelchair bound and dependent upon others for basic needs.

24.     Early on, however, it became clear that his cognitive functioning was unaffected. He completed his primary and secondary education in Manchester and then enrolled at the University of Manchester.  By necessity, his learning was mainly derived from listening:  holding or reading from books was impractical because of his hyperkinetic condition.  He came to the attention of researchers as a consequence of his heightened linguistic acquisition capacity.  For a number of years, he was a study subject at Cheltenham GCHQ---described as a British intelligence and security organization responsible for providing signals intelligence (SIGINT) to the government and armed forces.  He was found to be exceptionally intelligent.

25.     Since before entering the University of Manchester---despite the enormous challenges---Mr. Prior's goal was to become a trader at the London office of Goldman Sachs. He lived at his parents' home while attending college and received the help of graduate students to

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

1    take notes in his classes since he was unable to write legibly.  He graduated from the University in

2    2000 with upper second-class honors in Economics.

3    **B.  <u>Mr. Thornton's Background</u>**.

4              26.      Mr. Thornton does not suffer from a life-altering, disabling neurological condition.

5    He is, instead, an immensely powerful international businessman, a captain of industry---not

6    dependent on others for any of his needs, and neither physically nor financially vulnerable.  Mr.

7    Thornton was born in 1954.  His father was the Vice-Chairman of Consolidated Edison Company.

8    Mr. Thornton attended The Hotchkiss School, then entered Harvard College from which he

9    graduated with an A.B. in History in 1976, followed by a B.A./M.A. in Jurisprudence from Oxford

10   University in 1978, and a Master's in Public and Private Management from the Yale School of

11   Management in 1980.

12             27.      In 1980, following graduation from Yale, Mr. Thornton joined Goldman Sachs, and

13   continued with that firm for twenty-two years. Toward the end of that tenure---upon information

14   and belief---Goldman Sachs developed a succession model to deal with the anticipated retirement

15   of Henry M. Paulson, Jr., then Chief Executive Officer of Goldman Sachs.  Mr. Thornton and John

16   A. Thain were named as Co-Presidents and Co-Chief Operating Officers of Goldman Sachs in

17   1999.

18             28.      In addition to his position with Goldman, Mr. Thornton served on the boards of

19   other companies, including Ford Motor Company---a Goldman client whose Chairman and Chief

20   Executive Officer (William Clay Ford, Jr.) was a friend of Mr. Thornton's since prep school days

21   at The Hotchkiss School.

22             29.      Unexpectedly, on March 24, 2003, Mr. Thornton announced he was quitting his

23   positions as Co-President and Co-COO to become a professor at Tsinghua University in China, a

24   country with which Mr. Thornton maintained very close professional and personal relationships,

25   including with Li Ka-Shing and his son, Richard Li, both from Hong Kong.  It was reported that

26   his departure was not to be accompanied with a severance package.  Press reports stated that Mr.

27   Thain and Lloyd C. Blankfein were considered the likely successors to CEO Henry Paulson.  Mr.

28

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

1   Blankfein ultimately became Chairman and Chief Executive Officer of Goldman Sachs in 2006
2   when Mr. Paulson was selected as Secretary of the Treasury of the United States.

3   **C.  Mr. Prior's Career at Goldman Sachs and the Beginning of his Relationship with**
4   **Mr. Thornton.**

5       30.     Despite the odds, Mr. Prior joined Goldman Sachs in 2000 as a proprietary trader
6   (trading in investments with Goldman Sachs' own assets rather than equity trading with client
7   funds).  Early on, he attained renown, his disabilities and intelligence making him a unique person
8   amidst the range of Goldman employees.

9       31.     It was not easy, but Mr. Prior was able to handle---and to thrive---on the intellectual
10  challenges of proprietary trading.  The nature of the trading process de-emphasized the need for
11  rapid-fire communication that typified equity trading---which was a plus.  But his disabilities
12  remained.  His muscle contractions interfered with his ability to eat foods and drink liquids.  At
13  lunch, his food would have to be cut into small pieces by another and then given to him so he could
14  eat it very slowly.  To drink liquids, he needed someone to hold the cup or glass close to his mouth
15  so he could take small sips through a straw.  Bathroom needs required special attention.

16      32.     Before Mr. Thornton's unexpected departure from Goldman Sachs, Mr. Prior came
17  to the attention of Mr. Thornton, who was generous with his attention and advice to Mr. Prior.  Mr.
18  Prior was understandably flattered and considered Mr. Thornton to be a genuine friend.  Because
19  of Mr. Prior's own unique notoriety, he had certain contacts and was able to assist Mr. Thornton
20  and his family with requests made of him, including his assistance in Mr. Thornton's receiving---
21  in 2009---the U.S. Intercollegiate Tennis Association Achievement Award.

22      33.     As the years proceeded, Goldman Sachs became less accommodating of Mr. Prior's
23  disability.  He filed a grievance with the London Employment Tribunal in 2009 claiming
24  discriminatory treatment, a grievance procedure that is aided by the fact that it is private and allows
25  the parties to engage in discussions outside a public forum.  For reasons that were then and remain
26  unclear, Mr. Thornton urged Mr. Prior to publicize the dispute and involve the press.  Believing
27  Mr. Thornton was savvy as to both the dynamics of Goldman Sachs and the wisdom of involving
28

9

the press, Mr. Prior acceded---and a story was run in the *Institutional Investor* on October 16, 2009 entitled "Kieran Prior, The Whiz-Kid, Challenges Goldman Sachs."

34.     It was a mistake.  Goldman was publicly embarrassed and reverted to an aggressive, confrontational posture---litigious rather than privately mediative.  The damage was compounded by Mr. Thornton's failure to fulfill his commitment to loan Mr. Prior the funds to pay his solicitors and barristers in the Employment Tribunal case.  Ultimately, the case collapsed on Mr. Prior and was settled soon before the scheduled hearing in the summer of 2010 on less than favorable terms.  He was paid and not accommodated---and was terminated by Goldman Sachs under circumstances that squandered the goodwill that had existed between the company and Mr. Prior for years.

35.     Depressed, alienated from his Goldman Sachs' friends, no longer a part of Goldman Sachs, Mr. Prior turned to alcohol and use became abuse.  On December 2, 2011, he was admitted to intensive treatment at the University College London Hospital for seven (7) days and given a seventy percent (70%) chance of dying.  He survived and was transferred to another care facility for three weeks of high-dependency rehabilitation.  Thereafter, he entered nine months of alcohol dependency therapy and two and a half years of special psychiatric therapy at the Nightingale Psychiatric Hospital in London---where his therapy focused on his sense of failure and despair, as well as self-image issues relating to his disabilities.  By 2014 he was recovering.

**D.  Mr. Thornton:  New Business Efforts.**

36.     Following his departure from Goldman Sachs, Mr. Thornton advanced his personal and professional relationships in China but he also engaged in other business and other ventures.  He was selected as a Trustee of the Brookings Institution in 2000 and became the Co-Chairman of the Board after he funded the establishment of the John L. Thornton China Center at the Institution in 2006.

37.     Mr. Thornton joined the Board of Directors of HSBC North American Holdings, Inc., a subsidiary of a multinational British company engaged in banking and financial services.  Mr. Thornton for a time was the Non-Executive Chairman (a chairman of the board of directors who does not occupy a management position with the company and is not an employee) but quit in May of 2013, reportedly to spend more time on other business interests.

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

38.     In 2011, Mr. Thornton became a member of the advisory board of directors of Barrick Gold Corporation, was selected to be the Co-Chairman of the board in 2012, Chairman in 2014, and became the Executive Chairman of the board in 2017.

39.     Barrick Gold Corporation and Mr. Thornton engaged in re-structuring the business, explored merger options, and negotiated with foreign governments in countries where Barrick's mining assets were located, including Tanzania and Argentina.

40.     In the case of Tanzania, Mr. Thornton reportedly traveled to that country without the knowledge of other Barrick Gold Corporation's directors and negotiated a proposed agreement with the government in regard to issues concerning Barrick's troubled Acacia mining operations in Tanzania.

41.     Interactions with Argentinian governmental officials involved multiple issues, including---on information and belief---resolution of charges relating to toxic spills, efforts by Barrick Gold Corporation to dynamite mountain glaciers to allow access to potential gold reserves underlying the glaciers, a sale of a 50% interest in the Veladaro mine to a Chinese company (Shandong Gold Group), and issues related to a class action lawsuit filed in the Southern District of New York against Barrick and officers of the company for securities violations in regard to the Veladaro operations.

**E.  Recovery of Mr. Prior, Investigation into Artificial Intelligence Technology in California, and Mr. Thornton's Initial Expression of Interest.**

42.     In May 2012---as his recovery continued---Mr. Prior formed a company under the English Limited Liability Partnerships Act with Steven W. Cracknell, a friend he met at Goldman Sachs.  The company was named Pri Arc LLP, conceived by Mr. Prior to be a sort of arc for himself and others, a venture capital firm that would invest in promising start-ups.  It was to be a way forward for Mr. Prior.

43.     In the latter part of 2013, Mr. Prior and Mr. Cracknell became interested in a California-based technology company, Zenti, Inc. ("Zenti"), a Delaware corporation established in August of 2010 by Dr. Marc Byrd and his brother, Jeff. Dr. Byrd had a background in electrical engineering and physics and had conducted research on using artificial intelligence technology to

11

sort, categorize, and analyze vast quantities of data.  Mr. Prior and Mr. Cracknell believed the technology to be very promising and, through Pri Arc, initially invested $500,000 in Zenti in return for 50% of the shares and control of the board of directors.

44.   In early 2014, Mr. Prior met with Mr. Thornton.  They had remained in contact despite the London Employment Tribunal debacle.  On this occasion, the discussion turned to Zenti.  Mr. Thornton was very interested in the technology.  He asked if he could investigate further by having a tech-savvy friend of his, Dan Cohen, review the Zenti intellectual property.  Cohen did---and was impressed---and Mr. Thornton asked if he could be involved.  But Mr. Thornton also wanted one of his loyalists to meet with Zenti.

45.   Over the years, Mr. Thornton gathered a small group of men to help with his personal business interests outside of companies such as HSBC and Barrick.  They were younger, had worked with Mr. Thornton, had some significant accomplishments and training, but had challenges as their careers developed---to which Mr. Thornton was responsive.  They were very loyal---and beholden---to Mr. Thornton in consequence of the benefits he had bestowed on them, forming a relationship in which Mr. Thornton directed, controlled, and rewarded them, indirectly and directly:

a.   **Peter E. Bass**.  Defendant Bass (see ¶¶ 14, 15 of the Complaint) was born in 1963. He attended Princeton University, graduating *cum laude* in 1985 with a B.A. in public and international affairs.  He received a J.D. degree from Yale Law School. Thereafter, he served as the Executive Assistant to the National Security Advisor and Deputy Assistant Secretary for Energy, Sanctions, and Commodities, and then became Mr. Thornton's Chief of Staff at Goldman Sachs.  Upon leaving Goldman Sachs, Mr. Bass---with the assistance of Mr. Thornton---became a managing director of Promontory Financial Group, a subsidiary of IBM.  After Mr. Bass joined Promontory Financial Group, it reportedly received a multi-million-dollar consulting contract from HSBC America while Mr. Thornton was HSBC's Chairman.  After Mr. Thornton left HSBC, Mr. Bass left Promontory Financial Group and sought other employment.  Among other benefits, following the

12

1    termination of Mr. Bass' relationship with Promontory Financial, Mr. Thornton
2    arranged for Mr. Bass to have a consultancy with Barrick Gold Corporation---the
3    company for which Mr. Thornton then served as Chairman of the Board.

4        b.  **David S. Song**.  Defendant Song (see ¶¶ 16-17 of the Complaint) was born in 1971.
5    He attended Washington University, graduating with a B.A. in Biology in 1993.
6    He received a J.D. degree from the University of Pennsylvania Law School in 1996.
7    Thereafter, he was an associate with Debevoise & Plimpton LLP in New York, then
8    with Duval & Stachenfeld in New York, and then established his own firm, Song
9    P.C.  Mr. Song has served as one of Mr. Thornton's personal attorneys, being
10   referred to by Mr. Thornton as "my lawyer" and "my personal attorney."

11       c.  **Kevin R. Czinger**.  Mr. Czinger (see ¶¶ 11, 13 of the Complaint) was born in 1959.
12   He attended Yale College, graduating in 1981 with an A.B. in Classical
13   Civilization.  He was an outstanding football player:  he received the Asa S.
14   Bushnell Cup as the Ivy League MVP and was named a National Football
15   Foundation Hall of Fame Scholar Athlete.  He developed renown as an
16   undergraduate for being able to jump over the tops of cars even though he was not
17   tall.  Yale's legendary football coach, Carmen Cozza, was quoted as saying that
18   Mr. Czinger "was the toughest kid to play football at Yale in my 32 years as head
19   coach"---"the most unusual personality, probably the outstanding overachiever,
20   maybe the brightest student, and definitely the scariest individual."  Following
21   graduation, Mr. Czinger joined the U.S. Marine Corps Reserves, following which
22   he entered Yale Law School and obtained a J.D. degree in 1987.

23   Mr. Czinger completed a judicial clerkship, worked as an Assistant United States
24   Attorney for the Southern District of New York, and then joined Goldman Sachs
25   for a few years where he worked for Mr. Thornton.  After working at Goldman
26   Sachs and other firms, Mr. Czinger helped form Coda Automotive LLC in 2009
27   which he hoped would successfully manufacture electric vehicles.  More than One
28   Hundred Million Dollars ($100,000,000.00) was raised for the company, reportedly

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*    CASE NO. CV 19-4572
WRONGFUL DISCHARGE

1   with substantial assistance from Mr. Thornton in obtaining investments from
2   Chinese investors and others.  Mr. Czinger became the CEO of Coda in 2009,
3   abruptly resigned from the company in 2010 (reportedly by mutual consent), and
4   the company filed for bankruptcy in 2013.

5   **F.   The Collapse of Zenti and the Concentration of Stock into Ember Inc.**

6   46.   Having expressed an interest in Zenti and its artificial intelligence technology, in
7   2014, Mr. Thornton dispatched Mr. Czinger to meet with Zenti.  Mr. Czinger told Mr. Prior and
8   others that Mr. Thornton would make an investment in Zenti of $1,750,000 in return for being
9   issued preferred shares, given control of the board of directors, Mr. Czinger becoming Chief
10  Executive Officer, and Mr. Thornton becoming Chairman of the Board.  Mr. Czinger received
11  common stock in Zenti.  Mr. Prior and Mr. Cracknell were directed to move to California to be
12  close to the business operations.  The Thornton structure was adopted and Zenti proceeded
13  forward.

14  47.   During Mr. Czinger's tenure as Zenti's CEO, Marc Byrd---the innovator of the
15  Zenti technology---was gradually marginalized to the point that he left the company with little to
16  show for it.  Mr. Czinger expanded the staff and drove up expenses, while revenues and
17  investments declined.  Mr. Czinger resigned in 2015 but Mr. Thornton retained him as a member
18  of the Zenti board of directors.

19  48.   At Mr. Czinger's recommendation, Mr. Thornton appointed Mr. Cracknell as the
20  new CEO in 2015.  The balance sheet and revenue prospects continued to deteriorate.  Mr. Prior
21  personally put in hundreds of thousands of dollars to try to keep the business afloat.  Further, Mr.
22  Prior and Mr. Thornton each personally invested an additional sum (more than $900,000), secured
23  by convertible notes.

24  49.   In December of 2016, Mr. Cracknell sent a letter to Mr. Thornton which stated that-
25  --if a substantial infusion of money were not immediately secured---he, Mr. Cracknell, was going
26  to sell the intellectual property to a firm in Texas.  Mr. Thornton responded by authoring a cease
27  and desist notice to Mr. Cracknell and by directing that Mr. Cracknell be fired.

28

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

50. Mr. Thornton then selected Mr. Prior as Zenti's CEO. Accordingly, Mr. Prior was then a minority shareholder in Zenti, its CEO, and a member of its board of directors. Mr. Thornton and Mr. Prior decided the business should be rebranded to escape the reputation of Zenti as a failing business. For that purpose, in April 2017, Ember Inc. was formed with organizational documents drafted by Defendant Song. In consequence of the formation, all the investments, loans, and cash infusions into Zenti that had been made directly to that company, as well as the investments in Zenti made through Pri Arc, flowed into and became assets of the new entity, Ember Inc. ("Ember" or "Zenti-Ember and the Ember corporate structure")---with Zenti essentially becoming a holding company for the corporate structure.

51. Mr. Prior and others became minority shareholders in Ember. Mr. Prior became CEO and a member of Ember's board of directors. Mr. Thornton was the controlling shareholder, alter ego, and Chairman of the Board of Ember (through April 2018). Mr. Thornton claims--- through counsel---that his shares in Ember were transferred to a trust in June 2018 although no trust documents have been produced, the date of the trust has not been revealed, and conversations regarding the decision to form such trust (including conversations with Mr. Drimmer or others) have not been disclosed. Regardless, Mr. Thornton has maintained full, complete, and effective control over Ember, Mr. Bass, Mr. Czinger, and Mr. Song regarding the events relevant to this matter as discussed herein.

52. Defendant Song was selected by Mr. Thornton as General Counsel of Ember---and later as its corporate secretary---serving, then, simultaneously as General Counsel of the corporation, secretary of the corporation as of June 27, 2018 (as explained hereafter), and as a personal attorney for Mr. Thornton. Defendant Bass was the Chief Revenue Officer for Ember but was discharged from that position by Mr. Prior. Mr. Thornton served as Chairman of the Board of Ember until April 2018 when he selected Mr. Bass to succeed him in that position. Mr. Czinger remained a member of the board as Mr. Thornton directed. Both Mr. Bass and Mr. Czinger, therefore, had fiduciary duties to the corporation but were simultaneously beholden to Mr. Thornton for personal reasons and motives. Both Mr. Bass and Mr. Czinger were shareholders of Ember.

15

1      53.    Ember was firmly under the control of Defendant John L. Thornton.

2      **G.  Thornton's Control of Ember and Its Subservience to Barrick.**

3      54.    While the Zenti technology was being developed by Zenti, and later by Ember, Mr.

4  Thornton was deeply involved with his interests in Barrick Gold Corporation.  In 2014, he

5  engineered Barrick's attempted  buyout of Newmont Mining Corporation (a Colorado-based

6  company and one of the largest producers of gold in the world) but the effort failed.  By 2015, Mr.

7  Thornton reportedly turned his attention to Barrick acquiring Randgold Resources Ltd. (an

8  African-focused mining company) to create the world's largest gold mining company by market

9  capitalization.  The Barrick-Randgold negotiations were ongoing in 2017-2018 at the same time

10  negotiations were being undertaken, as described below, for a Barrick-Ember services contract as

11  described hereafter.  After Mr. Prior was terminated as Ember CEO on June 27, 2018 as described

12  hereafter, Barrick and Randgold entered a merger.  It is currently unknown to Mr. Prior the extent

13  to which the merger discussions with Barrick and Randgold influenced the conduct of Mr.

14  Thornton, Mr. Drimmer, and Barrick Gold Corporation during their negotiations with Ember and

15  Mr. Prior in 2018.

16      55.    While funding is always needed to develop technology, Ember's need was

17  particularly acute after Mr. Prior was selected as CEO following the tenures of Mr. Cracknell and

18  Mr. Czinger.  At that time, Mr. Thornton was increasingly focused on his opportunities with

19  Barrick Gold Corporation, yet he  was taking affirmative steps to maximize, protect, and expand

20  his financial position with Zenti and Ember.  Throughout 2017 and 2018---culminating with his

21  termination of Mr. Prior on June 27, 2018---Mr. Thornton's actions were increasingly self-

22  interested.  He repeatedly engaged in misconduct that violated his fiduciary duties to Ember and

23  Barrick, violated his duties to Mr. Prior as a minority shareholder of Ember, and violated

24  fundamental conflict of interest principles by which he had an obligation to abide as a result of his

25  positions as the Executive Chairman of Barrick Gold Corporation and as the controlling

26  shareholder and alter ego of Ember.

27      56.    In the months following his selection as CEO of Ember, Mr. Prior addressed

28  Ember's significant need for capital.  He contacted many potential investors and---within a short

16

time---received commitments for more than $4,000,000 in equity capital from substantial investors. The short-term goal was to raise $5,000,000. The initial success made that goal seem realistic. Excited by these developments, Mr. Prior reported them to Mr. Thornton. Rather than sharing the excitement, Mr. Thornton instructed Mr. Prior to discontinue the negotiations with potential equity investors and, instead, to attempt to negotiate a services agreement with Barrick Gold Corporation where---for a yearly fee---the Ember technology would be devoted to organizing the electronic data being generated by Barrick's mining operations, even though the optimum use and value of the technology could not be maximized by development within the narrow, circumscribed needs of a mining company. The artificial intelligence technology had far greater value by developing its potential for organizing and probing commercial data from a much broader range of commercial enterprises.

57. Mr. Thornton's action in preventing new equity investment in Ember foreclosed a capital-raising option that would have benefitted Ember---but would have reduced his own equity position in the company. Mr. Thornton violated his fiduciary duties to Ember and violated established principles of conflict of interest by making decisions to benefit himself both in regard to Ember and to Barrick Gold Corporation. Mr. Bass, Mr. Czinger, and Mr. Song concurred with Mr. Thornton's decisions and actions.

58. Mr. Thornton told Mr. Prior that Ember should offer a services agreement to Barrick Gold Corporation for a fee of $25,000,000 ($12,500,000 per year for two (2) years). Since Mr. Thornton was then Executive Chairman of Barrick and had explained inner workings of that company to Mr. Prior, including identifying the people with whom Mr. Prior should negotiate, Mr. Prior believed there was a basis for Mr. Thornton's $25,000,000 figure---and a contract in that amount would have been valuable to Ember. At Mr. Thornton's direction, then, equity investors from whom Mr. Prior had obtained commitments were left behind. The attention turned to Barrick.

59. In 2017, Mr. Prior had multiple meetings in Toronto with Barrick Gold Corporation, including its compliance and sustainability group, concerning the use to which the Zenti-Ember technology would be put for Barrick. Mr. Peter Sinclair, Barrick's Chief Sustainability Officer, was in attendance. The discussion concerned the type of Barrick data that

17

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*       CASE NO. CV 19-4572
WRONGFUL DISCHARGE

1    would be analyzed utilizing the search capabilities of Ember's technology.  Mr. Sinclair said he

2    had returned from Argentina and asked whether the technology could be used for Barrick's work

3    in Argentina.  During the discussion, mention was made of Argentina, similarities with Tanzania,

4    Mr. Thornton, and a man named Rosario.

5        60.    Based on discussions amongst Barrick personnel, Mr. Sinclair informed Mr. Prior

6    that the Ember technology would not be used to analyze data from Barrick's activities in such

7    countries as Argentina but, instead, Barrick and Ember should explore whether the technology

8    could be used to analyze Barrick's geologic data.  Thereafter, Barrick and Ember personnel worked

9    together to determine if the technology was suitable for that purpose and it was determined it was

10   not because that use would have required a graphical capability the Ember technology was not

11   designed to have.  Ultimately, the project with Barrick was defined:  Ember's technology would

12   be used to analyze human resource (HR) issues, including examining emails to detect whether they

13   contained any HR sensitive issues such as abusive or inappropriate remarks.

14       61.    From the outset of the negotiations with Barrick Gold Corporation, Mr. Prior was

15   told that Barrick had no intention of paying anything close to Mr. Thornton's $25,000,000 figure.

16   By the first months of 2018---it became clear that Barrick would offer, at most, $1,700,000 per

17   year for two years---far below the amount for which Mr. Prior had obtained commitments from

18   potential investors.  Mr. Thornton and his Ember appointees (Mr. Bass, Mr. Czinger, and Mr.

19   Song) instructed Mr. Prior to accept Barrick's offer.  Then arose the challenge of negotiating the

20   terms of a services agreement.

21   **H.  Overlapping Contractual Negotiations:  Breaches of Fiduciary Duties and Conflicts**

22       **of Interest**.

23       62.    One agreement between Ember and Barrick Gold Corporation shortly became two

24   agreements---one between Ember and Barrick and one between Ember and Mr. Prior. As described

25   below, defendants used both agreements to accomplish improper purposes and inappropriate ends,

26   in breach of the defendants' duties and expanding their conflicts of interest.

27       63.    Prior to Mr. Thornton's direction to Mr. Prior to stop raising equity capital and to

28   enter a services agreement with Barrick Gold Corporation, Mr. Prior did not have a written

18

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*         CASE NO. CV 19-4572
WRONGFUL DISCHARGE

employment agreement with Ember.  As the Ember-Barrick negotiations proceeded, however, the defendants started to push for Mr. Prior to have a written employment agreement.  Accordingly, as Mr. Prior undertook negotiations on the Ember-Barrick services agreement in the spring of 2018, negotiations were also commenced with Mr. Prior on his own employment agreement with Ember. Both negotiations focused almost exclusively, from the outset, on confidentiality, non-disclosure, and non-disparagement terms.  The defendants began a dual, coordinated attack from Ember (through Defendant Thornton, Defendant Bass, Defendant Song, and Mr. Czinger) and Barrick (through Defendant Thornton and Mr. Drimmer) that was designed to accomplish the same end:   to require Mr. Prior to capitulate to improper and inappropriate non-disclosure and confidentiality terms.

64.     From April until June 2018, defendants presented Mr. Prior with drafts containing improper and punitive terms that bore no relation to standard contractual terms for either non-disparagement or confidentiality.  While both confidentiality and non-disparagement have a role in commercial contracts, their role is tailored to the underlying purposes of such agreements:  to allow a party access to the other's business data while protecting that data from outside use or disclosure.  Those principles were abandoned in these negotiations.  The defendants sought to use the agreements to accomplish purposes that were divorced from those anchoring principles and to instead use them for personal and inappropriate ends---and to terminate Mr. Prior when he would not accede to their misconduct.

65.     The Barrick agreements were of different kinds---and different versions of those different kinds were submitted during the April-June 2018 period: Services Agreements, Mutual Non-Disclosure Agreement, and Article 27 Confidentiality/Data Pivacy [sic] and Security/Non-Disparragement [sic] Acknowledgements and Agreements.  Likewise, the Ember agreements were of different kinds---and different versions of those different kinds were submitted during the April-June period: Employment Agreements and Confidentiality and Proprietary Rights Agreements. Drafts were exchanged into June.[1]

---

[1]   Two of the documents bear some signatures.  First, a Mutual Non-Disclosure Agreement between Barrick and Ember has been produced that is dated April 20, 2018.  It bears an electronic

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

66.     The drafts proposed by or on behalf of the defendants became increasingly inappropriate, unacceptable, divergent from accepted business standards, and punitive.  Rather than the agreements being focused on confidential information obtained during the period that services were rendered or during the period of employment, the defendants sought to temporally expand the scope of the agreements by applying the confidentiality and non-disparagement to facts, information, and matters learned by Mr. Prior at any time before and any time after those periods.  In addition to the temporal expansion, the successive drafts by or on behalf of the defendants expanded the terms regarding the nature of the information: rather than being directed to confidential information or data of a bona fide  proprietary character, the draft terms were expanded to information of any kind.  A third expansion---as the iterations developed---was that Mr. Prior was to be held responsible for any disclosure or statement made---not only his own--- but by others in Ember and Barrick. As a fourth escalation, the defendants ultimately added a punitive provision calling for a $100,000 penalty in the event of any violation---by either Mr. Prior or anyone else described in the agreements---for which Mr. Prior would personally have to make payment.

67.     The escalating terms were punitive, unconscionable, and had no bona fide  relation to accepted commercial standards for confidentiality, non-disclosure, and non-disparagement provisions.  Discovery will be undertaken to determine whether the corporate defendants and the individual defendants used such provisions as a matter of practice and whether they bound themselves to such terms.  In the negotiation process that was being undertaken in the April-June

---

signature for Mr. Prior (Mr. Prior is unable to legibly sign documents because of his dystonia). He has no knowledge of electronically signing the document (a matter that plaintiff's counsel can explore in discovery)---but, nevertheless, the terms of that document were supplanted and rescinded by subsequent and more onerous agreements that Barrick submitted during the negotiation process. Second, a Services Agreement with Barrick has been produced that bears an electronic signature of Mr. Prior dated May 25, 2018. Mr. Prior believes he did electronically sign that document but upon the advice of General Counsel Defendant Song and without Mr. Prior's own thorough review.  Nevertheless, Mr. Prior has never been presented with a document indicating that any Barrick officials signed the agreement and---as with the April Mutual Non-Disclosure Agreement---it was supplanted and rescinded by subsequent and more onerous agreements submitted by Barrick in the following weeks.

20

1 | 2018 period, the only person who was being required---and pressured---to sign such onerous terms
2 | was Mr. Prior.

3 |      68.    The pressure, in fact, was immense on Mr. Prior---and that pressure was well-
4 | known to all the defendants.  He is severely disabled and---while quite brilliant and skilled---he
5 | has a significantly reduced employment potential  on the open employment market because of his
6 | physical disabilities.  He is married and acutely felt the responsibility as a spouse.

7 |      a.  Mr. Thornton's appointees---Mr. Bass, Mr. Song, and Mr. Czinger---repeatedly
8 |         exerted great pressure on Mr. Prior to accede to the demanded confidentiality, non-
9 |         disclosure, and non-disparagement terms and to sign the agreements in spite of their
10 |         punitive and inappropriate nature.

11 |      b.  It is alleged that those entreaties originated from Mr. Thornton.  There came a time,
12 |         for instance, when Mr. Prior told Mr. Czinger that he could not sign an agreement
13 |         as proposed and Mr. Czinger responded by saying, "Just f…ing sign it.  The
14 |         language is very important to John."

15 |      c.  He was also receiving pressure from Barrick Gold Corporation's Deputy General
16 |         Counsel Jonathan Drimmer to sign the documents even though Mr. Drimmer had
17 |         fundamental obligations---as Deputy General Counsel---for full legal compliance
18 |         with Barrick's corporate agreements.

19 |      d.  Barrick itself increased the pressure by withholding payments owed to Ember for
20 |         work already performed and billed by Ember personnel, thereby intensifying the
21 |         economic pressure on Mr. Prior personally and on other employees of the company
22 |         for whom Mr. Prior would feel responsible as CEO.

23 |      e.  Mr. Prior received pressure from Mr. Thornton by emails, telephone calls, and,
24 |         ultimately, by a personal visit.

25 |      69.    On June 14, 2018, Mr. Thornton directed  Mr. Prior to meet with him at the Four
26 | Seasons Hotel in San Francisco.  During the course of that meeting, Mr. Thornton discussed
27 | reasons why it was important to him and to Barrick that Mr. Prior sign the proposed agreements
28 | containing the language that defendants had demanded.  Mr. Thornton's explanation did not

21

change the inappropriate, punitive, and unacceptable nature of the demands, but instead highlighted them. Mr. Thornton's demand was made in breach of Mr. Thornton's fiduciary responsibilities both to Barrick Gold Corporation and to Ember. It was a complete breach of his fiduciary responsibilities to Mr. Prior who was then the CEO of Ember and a minority shareholder of Ember. The discussion was a stark violation of conflict of interest inasmuch as---while in San Francisco and while engaged in the discussion with Mr. Prior---Mr. Thornton was the Executive Chairman of Barrick but also the controlling shareholder and alter ego of Ember.

70. During the conversation, Mr. Thornton recommended that Mr. Prior's employment contract counsel have further discussion with Barrick Deputy General Counsel Drimmer. Although defendants recommended that Mr. Prior's employment counsel, Thomas Klein, travel to Toronto for the meeting, Mr. Klein talked to Mr. Drimmer by telephone. During that conversation, Mr. Drimmer shared with Mr. Klein reasons why it was important to Barrick that Mr. Prior sign the documents as defendants had demanded. But---as with the discussion with Mr. Thornton--- the explanation did not change the inappropriate, punitive, and unacceptable nature of the demands, but, rather, enhanced the concerns.

**I. <u>Termination</u>.**

71. Defendants' efforts to force Mr. Prior to sign the agreements culminated on June 27, 2018. A meeting of the Ember Board of Directors was called for that date at Ember's principal place of business in San Francisco. Mr. Bass, Mr. Song, and Mr. Czinger attended by telephone. Mr. Prior was present in person. In the agenda sent by email to the meeting attendees beforehand, there was no mention that Mr. Prior's employment status would be discussed. But when the meeting convened, it became apparent that that was---in fact---the purpose of the meeting. Prior to the meeting, Mr. Prior was far more engaged and involved with the Ember technology and business activities than was any other person participating in the meeting. Mr. Prior had first taken note of the extraordinary opportunity that Dr. Byrd's artificial intelligence technology offered. Through Pri Arc, Mr. Prior was the first to have invested in Zenti. Mr. Prior had been working effectively since 2014 and, since 2016, had served as the CEO. Although the purpose of the meeting was to discuss his status with the company, the only issue raised during the meeting was

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

Mr. Prior's refusal to sign the inappropriate Ember employment agreement and Ember-Barrick agreement as demanded.  Mr. Prior's skill and expertise with technology and his leadership of Ember were never questioned but were, instead, accepted.   June 27, 2018 was about the defendants' response to Mr. Prior's refusal to sign the documents with their unacceptable, inappropriate, and punitive terms.

72.    Mr. Prior was fired---by unanimous action of Mr. Thornton's group: Defendant Bass, Defendant Song, and Mr. Czinger.  Mr. Song was not eligible to vote as a director but concurred with the result.

73.    Although Mr. Thornton was apparently not a telephone participant for the June 27 termination meeting, it is alleged that he had communication with his group prior to the meeting, he told them he wanted Mr. Prior terminated, and he fully directed and ratified the result.

    a.   The actions of Defendant Thornton, Defendant Bass, Defendant Song, and Mr. Czinger in terminating Mr. Prior were taken solely for personal benefit and inappropriate reasons rather than for the benefit and in the best business interest of Ember.  In fact, terminating Mr. Prior was directly contrary to the best business interests of Ember.  Defendants Thornton, Bass, and Song were self-interested and motivated by improper purpose.

    b.   In doing so, defendants breached their fiduciary duties owed to Ember and breached their fiduciary duties owed to Mr. Prior as a minority shareholder.

    c.   In terminating Mr. Prior, defendants damaged Ember because it diminished---and perhaps effectively eliminated---the value of Ember's most important asset, its rights to the Zenti/Ember artificial intelligence technology.   The proper development of that technology was reliant on the leadership and guidance provided by Mr. Prior.

73.    In terminating Mr. Prior and causing Mr. Prior to be terminated, Defendant Thornton, Mr. Drimmer, Defendant Barrick [through the actions of its Executive Chairman and Deputy General Counsel (Defendant Thornton and Mr. Drimmer) for which it is responsible], Defendant Bass, Defendant Song, and Mr. Czinger aided and abetted the intentional tortious

23

misconduct as alleged in this Complaint that caused damage to Mr. Prior. Each of them (a) with actual knowledge that their own and the others' misconduct constituted a breach of duty, provided substantial assistance or encouragement to the others to so act, or (b) gave substantial assistance to the others in accomplishing a tortious result and with the actual knowledge that the conduct of each of them, separately considered, constituted a breach of duty owed to Mr. Prior.

74. In terminating Mr. Prior, Mr. Thornton's misconduct was improper in regard to his fiduciary duties owed to Ember and Barrick---as well as to his fiduciary duties owed to Mr. Prior:

   a. In terminating Mr. Prior, Mr. Thornton was engaged in a glaring conflict of interest between his fiduciary duties and responsibilities owed to Ember and his fiduciary duties and responsibilities owed to Barrick. In both regards, he ignored the conflicts of interest---and proceeded in an effort to maximize his personal interest.

   b. In terminating Mr. Prior, Mr. Thornton violated his fiduciary responsibilities owed to Ember and his fiduciary responsibilities owed to Barrick.

75. In requiring Mr. Prior to sign the agreements and in accomplishing his firing for failure to do so, Mr. Thornton inextricably mixed his several interests and responsibilities---to Barrick and to Ember---with his own personal interests, elevating and giving preference to his personal interests over the other interests. It was a stark and clear violation of conflict of interest, of which Barrick Gold Corporation, including its Deputy General Counsel, Mr. Drimmer, should have been completely aware, should have declared the conflict, and should have prevented. It is alleged that Mr. Drimmer was aware that retribution was to be taken against Mr. Prior, that he agreed with such actions, and that he took no steps to prevent Mr. Thornton and his group from engaging in that conduct even though Mr. Drimmer should have been fully aware that all of those circumstances violated basic and fundamental compliance standards for which he had responsibility. It is alleged, therefore, that Mr. Thornton and Mr. Drimmer engaged in collusive misconduct, jointly aiding and abetting one another and others as alleged. Barrick Gold Corporation is liable for the misconduct of its Executive Chairman and its Deputy General Counsel as a consequence of the doctrine of vicarious liability and the fact that each of them had fundamental control and responsibility for the actions of Barrick. Each was a prime mover in

24

1    regard to the operations of Barrick and its responsibility for their misconduct is, accordingly,

2    heightened.

3          76.      The misconduct against Mr. Prior continued beyond June 27, 2018, including the

4    following:

5           a.     After June 27, Mr. Bass (at least) convened one or more meetings of the boards of

6                Zenti and Ember---without providing the required notice to Mr. Prior and thereby

7                depriving him of notice and an opportunity to participate---and unlawfully removed

8                Mr. Prior as a director of Zenti and Ember and as CEO of Zenti. It is unknown at

9                this time the extent to which Mr. Thornton, Mr. Czinger, and Mr. Song knew of

10               such actions---and the extent to which they directed and agreed with such actions-

11               --but discovery will be undertaken to learn the extent of any such involvement.

12           b.    Moreover, following the employment termination on June 27, 2018, the health

13               insurance that Mr. Prior maintained through Zenti-Ember and the Ember corporate

14               structure was cancelled in spite of the fact that all parties were fully aware of Mr.

15               Prior's medical condition and his need for consistent and reliable medical care. It

16               is not known at this point the extent to which Defendants Thornton, Bass, and Song

17               had knowledge of such cancellation---or the extent to which they caused or ratified

18               such action to be accomplished. Discovery will be undertaken to learn the extent

19               of any such involvement.

20          77.      Defendant Thornton, Defendant Bass, and Defendant Song consciously and

21    willfully engaged in conduct directed against Mr. Prior with malice and oppression. Accordingly,

22    such defendants are liable for punitive damages to deter them and others similarly situated from

23    future similar misconduct.

24    **VI.**      **FIRST CLAIM FOR RELIEF: WRONGFUL DISCHARGE IN VIOLATION OF**

25            **PUBLIC POLICY [DEFENDANTS EMBER, THORNTON, BASS, SONG, AND**

26            **BARRICK (AS A CONSEQUENCE OF THE MISCONDUCT OF DEFENDANT**

27            **THORNTON AND MR. DRIMMER)]**

28

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*      CASE NO. CV 19-4572
WRONGFUL DISCHARGE

78.     Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 77 above as if fully set forth herein.

79.     At all times relevant to the events herein, Mr. Prior was employed by and acting within the course and scope of his employment, and for the economic benefit of, Ember Inc.

80.     Ember owed duties of care to Mr. Prior as a consequence of his position and stock ownership in Ember.  Those duties were breached by Defendant Ember as alleged herein.

81.     Defendant Ember terminated Mr. Prior as Chief Executive Officer on June 27, 2018.

82.     The termination was substantially motivated by violations of fundamental public policies---policies that were clearly contravened by Ember's termination of Mr. Prior.  The termination was occasioned by Mr. Prior's unwillingness to violate a statute or constitutional provision, his refusal to effectively forego that which could be a statutory obligation or constitutional right, or his failure to relinquish statutory or constitutional rights or obligations.

83.     The fundamental public policies that were contravened were supported by constitutional or statutory provisions, the policies are public in that they inure to the benefit of the public rather than serving merely the interests of the individual, the policies were articulated at or before the time of discharge, and the policies were fundamental and substantial.

84.     The wrongful discharge was aided and abetted by the misconduct of Defendants Thornton, Bass, Song, and Barrick as alleged herein.[2]  Defendant Thornton's self-interested actions were undertaken as the alter ego of Ember as well as the Executive Chairman of Defendant Barrick; he was also the controlling shareholder of Ember.  Defendant Bass's self-interested

---

[2] In naming Defendants Thornton, Bass, Song, and Barrick in this claim for relief---in addition to Defendant Ember---plaintiff's counsel note that they are aware of the holdings in the following cases: *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 178, 610 P.2d 1330, 1336-37 (Cal. 1980); *Miklosy v. Regents of University of California*, 44 Cal. 4th 876, 900, 188 P.3d 629, 644 (Cal. 2008); *Garcia v. Witt*, 2010 Cal. App. Unpub. LEXIS 4199 *6-7. *Tameny* was the seminal decision from the California Supreme Court that established the tort cause of action for wrongful discharge by an employee against her or his employer.  The holdings in *Miklosy* and *Garcia* emphasized the employer as being the proper defendant.  Plaintiff's counsel---in good faith---believe that the holdings in those cases do not exclude the claim for relief under *Tameny* against Defendants Thornton, Bass, Song, and Barrick.

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

actions were undertaken as a member of the board of directors of Ember; Defendant Bass was also a shareholder of Ember. Defendant Song's self-interested actions were undertaken as outside General Counsel of Ember, as corporate secretary, and as private counsel to Defendant Thornton. Defendant Barrick is liable for the misconduct of Defendant Thornton both as a consequence of the doctrine of vicarious liability as well as a consequence of Defendant Thornton's dominant role in Barrick Gold Corporation as its Executive Chairman.  In equal fashion, Barrick is liable for the misconduct of its Deputy General Counsel Drimmer.

85.    The discharge caused harm to Mr. Prior.

86.    The misconduct of Defendant Ember as alleged herein constituted a substantial factor in causing the damages suffered by Mr. Prior as is more specifically detailed in that section of this Complaint denominated as "Damages."

## VII.    SECOND CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY (DEFENDANTS THORNTON, BASS, AND SONG)

87.    Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 86 above as if fully set forth herein.

88.    In their respective positions as controlling shareholder, alter ego of Ember and its corporate structure, shareholder, officer, chairman,  general counsel, and/or director, Defendants Thornton, Bass, and Song owed fiduciary duties of due care and loyalty to Mr. Prior (an officer, director, and minority shareholder of Ember and its corporate structure), thereby imposing upon them the duty to exercise their corporate influence fairly and for the benefit of Mr. Prior and to act with utmost good faith in his best interests ("fiduciary duties").

89.    Defendants Thornton, Bass, and Song breached their fiduciary duties to Mr. Prior by engaging in the misconduct alleged herein.

90.    The breach of fiduciary duties by Defendants Thornton, Bass, and Song caused harm to Mr. Prior.

91.    Mr. Prior was the only Ember shareholder harmed by the breach of fiduciary duties by Defendants Thornton, Bass, and Song.

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

92.     The breach of fiduciary duties by Defendants Thornton, Bass, and Song as alleged herein constituted a substantial factor in causing the damages suffered by Mr. Prior as is more specifically detailed in that section of this Complaint denominated as "Damages."

## VIII.   THIRD CLAIM FOR RELIEF: INTERFERENCE WITH PROSPECTIVE ECONOMIC OPPORTUNITY [DEFENDANTS THORNTON, BASS, SONG, AND BARRICK (AS A CONSEQUENCE OF THE MISCONDUCT OF DEFENDANT THORNTON AND MR. DRIMMER)]

93.     Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 92 above as if fully set forth herein.

94.     Mr. Prior and Ember Inc. were in an economic relationship that probably would have resulted in future economic benefit to Mr. Prior.

95.     Defendants Thornton, Bass, Song, and Mr. Drimmer knew or should have known of this relationship.

96.     Defendant Barrick Gold Corporation is liable for the misconduct of Defendant Thornton both as a consequence of the doctrine of vicarious liability as well as a consequence of Defendant Thornton's dominant role in Barrick Gold Corporation as its Executive Chairman.  In equal fashion, Barrick is liable for the misconduct of its Deputy General Counsel Drimmer.

97.     Defendants Thornton, Bass, Song, and Mr. Drimmer knew or should have known that this relationship would be disrupted if they failed to act with reasonable care.

98.     Defendants Thornton, Bass, Song, and Mr. Drimmer failed to act with reasonable care.

99.     Defendants Thornton, Bass, Song, and Mr. Drimmer engaged in wrongful, tortious misconduct that violated duties of care owed to Mr. Prior, that constituted violations of fundamental public policies, that were abusive, and that resulted in Mr. Prior's termination from his position with Ember Inc.

100.    The relationship was disrupted.

101.    Mr. Prior was harmed.

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

102. The misconduct of Defendants Thornton, Bass, Song, and Barrick (as a consequence of the misconduct of Defendant Thornton and Mr. Drimmer) constituted a substantial factor in causing the damages suffered by Mr. Prior as is more specifically detailed in that section of this Complaint denominated as "Damages."

## IX. FOURTH CLAIM FOR RELIEF: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC OPPORTUNITY [DEFENDANTS THORNTON, BASS, SONG, AND BARRICK (AS A CONSEQUENCE OF THE MISCONDUCT OF DEFENDANT THORNTON AND MR. DRIMMER)]

103. Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 102 above as if fully set forth herein.

104. Defendants Thornton, Bass, Song, and Mr. Drimmer intentionally interfered with the economic relationship between Mr. Prior and Ember Inc. that would more probably than not have resulted in economic benefit to Mr. Prior.

105. Defendant Barrick is liable for the misconduct of Defendant Thornton both as a consequence of the doctrine of vicarious liability as well as a consequence of Defendant Thornton's dominant role in Barrick Gold Corporation as its Executive Chairman. In equal fashion, Barrick is liable for the misconduct of its Deputy General Counsel Drimmer.

106. Mr. Prior and Ember Inc. were in an economic relationship that more probably than not would have resulted in an economic benefit to Mr. Prior.

107. Defendants Thornton, Bass, Song, and Mr. Drimmer knew of the relationship between Mr. Prior and Ember Inc. They engaged in wrongful, tortious misconduct that violated duties of care owed to Mr. Prior, that constituted violations of fundamental public policies, that were abusive, and that resulted in Mr. Prior's termination from his position with Ember Inc.

108. By engaging in such misconduct, Defendants Thornton, Bass, Song, and Mr. Drimmer intended to disrupt the relationship or knew that disruption of the relationship was certain or substantially certain to occur.

109. The relationship was disrupted.

110. Mr. Prior was harmed.

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA* CASE NO. CV 19-4572
WRONGFUL DISCHARGE

111.   The misconduct of Defendants Thornton, Bass, Song, and Barrick (as a consequence of the misconduct of Defendant Thornton and Mr. Drimmer) constituted a substantial factor in causing the damages suffered by Mr. Prior as is more specifically detailed in that section of this Complaint denominated as "Damages."

**X.     FIFTH CLAIM FOR RELIEF: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (DEFENDANTS THORNTON, BASS, AND SONG---AS WELL AS DEFENDANT BARRICK AS A CONSEQUENCE OF THE MISCONDUCT OF DEFENDANT THORNTON AND MR. DRIMMER)**

112.   Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 111 above as if fully set forth herein.

113.   Defendants Thornton, Bass, Song, and Mr. Drimmer were negligent.

114.   Defendant Barrick is liable for the misconduct of Defendant Thornton both as a consequence of the doctrine of vicarious liability as well as a consequence of Defendant Thornton's dominant role in Barrick Gold Corporation as its Executive Chairman.   In equal fashion, Barrick is liable for the misconduct of its Deputy General Counsel Drimmer.

115.   Mr. Prior suffered serious emotional distress.

116.   The negligence of Defendants Thornton, Bass, Song, and Drimmer was a substantial factor in causing Mr. Prior's serious emotional distress.

117.   The misconduct of Defendants Thornton, Bass, Song, and Barrick (as a consequence of the misconduct of Defendant Thornton and Mr. Drimmer) constituted a substantial factor in causing the damages suffered by Mr. Prior as is more specifically detailed in that section of this Complaint denominated as "Damages."

**XI.    SIXTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (DEFENDANTS THORNTON, BASS, AND SONG---AS WELL AS DEFENDANT BARRICK AS A CONSEQUENCE OF THE MISCONDUCT OF DEFENDANT THORNTON AND MR. DRIMMER)**

118.   Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 117 above as if fully set forth herein.

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

119.    The conduct of Defendants Thornton, Bass, Song, and Mr. Drimmer was outrageous.

120.    Defendant Barrick is liable for the misconduct of Defendant Thornton both as a consequence of the doctrine of vicarious liability as well as a consequence of Defendant Thornton's dominant role in Barrick Gold Corporation as its Executive Chairman.   In equal fashion, Barrick is liable for the misconduct of its Deputy General Counsel Drimmer.

121.    Defendants Thornton, Bass, Song, and Mr. Drimmer intended to cause Mr. Prior emotional distress.

122.    Defendants Thornton, Bass, Song, and Mr. Drimmer acted with reckless disregard of the probability that Mr. Prior would suffer emotional distress, knowing that Mr. Prior would be present when the planned conduct occurred.

123.    Mr. Prior suffered severe emotional distress.

124.    The misconduct of Defendants Thornton, Bass, Song, and Barrick (as a consequence of the misconduct of Defendant Thornton and Mr. Drimmer) constituted a substantial factor in causing the damages suffered by Mr. Prior as is more specifically detailed in that section of this Complaint denominated as "Damages."

## XII.    SEVENTH CLAIM FOR RELIEF: FRAUD (DEFENDANT THORNTON)

125.    Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 124 above as if fully set forth herein.

126.    Defendant Thornton represented to Mr. Prior that claimed facts were true.

127.    Such representations by Defendant Thornton were false.

128.    Defendant Thornton knew that the representations were false when he made them, or that he made the representations recklessly and without regard for their truth.

129.    Defendant Thornton intended that Mr. Prior rely on the representations.

130.    Mr. Prior reasonably relied on Defendant Thornton's representations.

131.    The representations substantially influenced Mr. Prior's actions which he would not have undertaken without such representations.

132.    Mr. Prior was harmed.

31

133.   Mr. Prior's reliance on Defendant Thornton's representations constituted a substantial factor in causing the damages suffered by Mr. Prior as is more specifically detailed in that section of this Complaint denominated as "Damages."

## XIII.   DAMAGES

134.   Plaintiff hereby incorporates all statements and allegations contained in paragraphs 1 through 133 above as if fully set forth herein.

135.   Mr. Prior was injured and is entitled to recover damages against the defendants in this matter for their misconduct as alleged herein which was a substantial factor in causing such damages.  The damages include the following:

    a.   Loss of past and future earnings and his going-forward income as CEO and an employee of Zenti-Ember and the Ember corporate structure in an amount to be proven at trial;

    b.   Loss of employment benefits from Zenti-Ember and the Ember corporate structure in an amount to be proven at trial;

    c.   Loss of the value of his cash investments and loans to Zenti-Ember and the Ember corporate structure in an amount to be proven at trial;

    d.   Loss of the return on the value of his services rendered in the development and operation of Zenti-Ember and the Ember corporate structure ("sweat equity") in an amount to be proven at trial;

    e.   Loss of the return on his investment of cash, loans, and sweat equity in Zenti-Ember and the Ember corporate structure, including the future value of Zenti-Ember and the Ember corporate structure and the value of the intellectual property controlled by such structure, in an amount to be proven at trial;

    f.   Loss of prospective economic opportunity in Zenti-Ember and the Ember corporate structure in an amount to be proven at trial;

    g.   Physical pain and suffering in an amount to be proven at trial;

    h.   Emotional pain and suffering accompanied by physical symptoms in an amount to be proven at trial;

32

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*          CASE NO. CV 19-4572
WRONGFUL DISCHARGE

1

## DEMAND FOR JURY TRIAL

2      Kieran T. Prior, pursuant to Rule 38, Federal Rules of Civil Procedure, hereby demands a

3 jury trial on all claims for relief, claims, or issues in this action that are triable as a matter of right

4 to a jury.

5                                                            Respectfully submitted,

6

7

8 Dated: August 7, 2019                          By:  /s/  Laurence O. Masson
                                                      Laurence O. Masson
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34

KIERAN T. PRIOR'S COMPLAINT FOR, *INTER ALIA*      CASE NO. CV 19-4572
WRONGFUL DISCHARGE